**Larry C. HOLMES, Plaintiff,**

v.

**Benjamin WARD, as Commissioner of Correction of the City of New York, William Bird, Mr. Long, C.O., Brooklyn House of Detention for Men, and John Doe, Defendants.**

No. 79 C 481.

United States District Court, E.D. New York.

July 7, 1983.

H. Lake Wise, Elise A. Bloustein, New York City, for plaintiff.

Frederick A.O. Schwarz, Corp. Counsel of the City of New York, New York City (Bradley S. Tupi, New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge.

Plaintiff brought this action under 42 U.S.C. § 1983 to redress an alleged deprivation of his interests in personal security protected by the Fourteenth Amendment. To this federal claim he joined negligence claims under New York state law. Defendants move for summary judgment.

On this motion the court accepts the facts stated in plaintiff's affidavit and draws all permissible inferences in his favor. *Bianco v. Board of Trustees of Local 816,* 494 F.Supp. 206, 207 (E.D.N.Y.1980). The pertinent facts, so viewed, are as follows.

On August 16, 1978, at about 7:30 p.m., while a pretrial detainee at the Brooklyn House of Detention for Men, plaintiff was violently assaulted by Centeno Rios, another inmate. Officers witnessed the attack and heard Rios threaten to kill plaintiff.

By 9:30 p.m. both plaintiff and Rios were put in separate cells on the third floor. Captain Quevedo ordered Correction Officer Colmer, then on duty on the floor, to post a notice that plaintiff and Rios were not to be allowed out of their cells at the same time. An officer informed plaintiff that he and Rios would not be locked out simultaneously. Following customary procedure Colmer wrote out in his own hand the so-called alternate lockout order and posted it on the third floor bulletin board. Inmates had access to the bulletin board, and a large fan operated nearby.

At least one of two officers who came on duty about midnight saw the alternate lockout order on the bulletin board. However, according to their depositions, none of the three officers who arrived on duty at 8:00 a.m. the next day, including defendants Bird and Long, saw the order. Their testimony does not show whether they looked at the bulletin board. But, according to a later report of the Deputy Warden, the order had "disappeared" from the bulletin board by the time of lock-out at 8:30 a.m.

That morning, supposing that he would be locked out separately from Rios, plaintiff left his cell to take a shower. When told that his wife was calling, plaintiff went to the telephone where Rios attacked him from behind and smashed his face into a gate of bars. Bleeding profusely, plaintiff was taken to the prison clinic and then by ambulance to a hospital. He was in surgery for three to four hours. For several months thereafter he suffered from recurrent severe headaches and occasional dizziness and nausea. His headaches have since become less frequent and less severe. A large scar on his face is permanent.

Plaintiff claims that defendants deprived him of a liberty interest—his right to be secure in his person—without due process. He urges that the prison's procedures were inadequate to ensure that he was kept apart from an inmate who had threatened to take his life. Aside from a handwritten note on a bulletin board exposed to acts of God and inmates, there were no measures taken to protect him from a man such as

Rios. There was no established procedure for making an entry on locator cards used to keep track of inmates, or in the log book in which inmate movements, officers' tours of the area and other matters were noted. Nor was there a requirement that one shift tell the next of the need for alternate lockouts.

Defendants argue first that the facts show that they were at worst negligent and that a § 1983 claim based on a due process violation requires greater culpability, and second that state tort law provides plaintiff all the process he is due.

Defendants' first contention was addressed by the Supreme Court in *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). The Court ruled that § 1983 contains no state of mind requirement in addition to that of the underlying constitutional provision allegedly violated, and that the Fourteenth Amendment may protect against negligent deprivations.

Defendants' second argument requires more extensive analysis. The *Parratt* case concerned the negligent deprivation of property by a random and unauthorized official act. Parratt, an inmate, ordered by mail certain hobby materials. In violation of prison procedures two prison employees, rather than Parratt, signed for the packages when they arrived. When he asked for them prison officials could not find them. He sued, alleging a § 1983 claim for the negligent loss. The Supreme Court reasoned that, since a hearing before such an unpredictable deprivation would have been impracticable if not impossible, a postdeprivation hearing was sufficient. The Court held that because a state tort action would afford such a hearing Parratt was provided the process he was due. *Id.* at 541–46, 101 S.Ct. at 1916–18.

The twin holdings of the *Parratt* case—affording constitutional protection against negligent deprivations, but denying a § 1983 action where such protection was provided by an adequate state remedy—have not led the lower courts to develop a uniform approach. Instead, they have based their different analyses on one or

more of three sets of distinctions: (1) property vs. liberty interests; (2) negligent vs. intentional deprivations; and (3) random and unauthorized official acts vs. established procedure.

Some courts have focused on the difference between property and liberty interests in determining whether state tort remedies provide constitutionally adequate procedure. For example, the Ninth Circuit in *Wakinekona v. Olim,* 664 F.2d 708, 715 (9th Cir.1981), *rev'd on other grounds,* —— U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), stated that a case involving liberty interests is "of a wholly different nature" than one involving property interests and refused to apply the *Parratt* decision to the former. *See also Howse v. DeBerry Correctional Institute,* 537 F.Supp. 1177 (M.D.Tenn. 1982). *But see Eberle v. Baumfalk,* 524 F.Supp. 515 (N.D.Ill.1981). This view finds support in Justice Blackmun's concurring opinion in the *Parratt* case. He did "not read the Court's opinion as applicable to a case concerning deprivation of life or of liberty." 451 U.S. at 545, 101 S.Ct. at 1917.

Although for reasons detailed below the distinction between liberty and property interests has significance in determining what due process requires, clearly the analysis in the *Parratt* majority opinion is not *per se* inapplicable to deprivations of liberty interests. Indeed, that opinion relied on *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), in which the Court found no predeprivation procedures necessary for the reason, among others, that there were common law safeguards against erroneous deprivations of the liberty interest there at stake.

Other lower courts have pointed to the distinction between negligent and intentional deprivations. In *Tarkowski v. Hoogasian,* 532 F.Supp. 791 (N.D.Ill.1982), the court held the *Parratt* ruling inapplicable to a case of intentional deprivation of property. The court, relying on the Congressional intent underlying § 1983 to deter official misconduct, stated:

"We do not read *Parratt* as going beyond its own facts. The Court, in *Parratt,*

certainly did not repeal section 1983 in cases in which a state official's intentional deprivation of constitutional rights including property rights is involved simply because a state tort action may be available. Only Congress could effect such a repeal and it has not done so." *Id.* at 795.

This reasoning was adopted by other courts in cases involving deprivations of property and liberty interests. *See, e.g., Peters v. Township of Hopewell,* 534 F.Supp. 1324 (D.N.J.1982) (property); *Howse v. DeBerry Correctional Institute, supra* (liberty).

It is true that Justice Blackmun's concurring opinion in the *Parratt* case emphasized the difference between negligent and intentional deprivations:

"While the 'random and unauthorized' nature of negligent acts by state employees makes it difficult for the State to 'provide a meaningful hearing before the deprivation takes place,' it is rare that the same can be said of intentional acts by state employees." *Parratt v. Taylor, supra,* 451 U.S. at 546, 101 S.Ct. at 1918 (citation omitted).

But his reasoning did not rest on the Congressional purpose underlying § 1983. The issue posed in the *Parratt* case was not the legislative purpose of § 1983 but the requirements of the due process clause of the Constitution.

The *Parratt* majority opinion discussed cases in which procedural due process was satisfied by a postdeprivation remedy either because the state needed to take swift action or because there was no practical way, as in the case of Parratt's loss, to provide predeprivation process. It is, of course, typically practicable to afford procedural safeguards before intentional deprivations. Justice Blackmun cited such instances as the termination of welfare benefits, *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the seizure of debtor's property, *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and the garnishment of wages, *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). However, the generalization has its exceptions. For example,

in *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1352 (9th Cir.1981), plaintiff alleged that his football coach intentionally assaulted him. Procedural safeguards were just as impractical before that unauthorized, albeit intentional, act as before the negligent act in the *Parratt* case. *But see Howse v. DeBerry, supra.*

Thus, it is not the distinction between negligent and intentional acts that determines whether postdeprivation procedure is sufficient. The question in this case is rather whether the nature of the act renders the provision of predeprivation safeguards impracticable. It may be that negligent deprivations are generally random and unauthorized, and intentional deprivations are generally predictable. But whether predeprivation safeguards are practicable depends on whether the deprivations result from random, unpredictable acts or are generated predictably by established state procedure.

That distinction was critical to the *Parratt* decision. The Court stated:

"The justifications which we have found sufficient to uphold takings of property without any predeprivation process are applicable to a situation such as the present one involving a tortious loss of a prisoner's property as a result of a random and unauthorized act by a state employee. In such a case, the loss is not a result of some established state procedure and the State cannot predict precisely when the loss will occur." *Parratt v. Taylor, supra* 451 U.S. at 541, 101 S.Ct. at 1916.

The Court reemphasized this distinction in *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). Plaintiff there filed an employment discrimination charge with the state fair employment commission. By state statute the commission had 120 days to convene a fact finding conference, a jurisdictional prerequisite for a formal adversarial hearing before the commission. Inadvertently the commission failed to convene a timely conference, and plaintiff's charge was dismissed. The Supreme Court held that the

dismissal deprived him of a property interest—that is, his cause of action—without due process. The Court noted that the *Parratt* case involved a loss of property as a result of a random and unauthorized act rather than of an established state procedure, and stated:

"Here, in contrast, it is the state system itself that destroys a complainant's property interest, by operation of law, whenever the Commission fails to convene a timely conference—whether the Commission's action is taken through negligence, maliciousness or otherwise.... Unlike the complainant in *Parratt,* Logan is challenging not the Commission's error, but the 'established state procedure' that destroys his entitlement without according him proper procedural safeguards." *Id.* at 436, 102 S.Ct. at 1158.

The distinction between random and unauthorized acts and established state procedure was applied to facts closer to those of this case in *Pantoja v. City of Gonzales,* 538 F.Supp. 335 (N.D.Calif.1982). Plaintiffs there were the heirs of a man whom police found drunk and asleep in the street. The police placed him in a holding cell, where he was found dead eight hours later. The court rejected defendants' motion to dismiss plaintiffs' claim that the decedent was deprived of liberty without due process. *Parratt v. Taylor* was held inapplicable because plaintiffs' claim was based not on a random and unauthorized act but on the established state procedure for the handling of persons taken into custody under the state's public drunk law.

Plaintiff does not attack here a random and unauthorized act but the established procedure for insuring the separation of an inmate from a proven and deadly assailant. This distinction, however, answers only the initial question of whether more stringent predeprivation safeguards are feasible. It provides no standard for determining which established state safeguards are adequate to satisfy due process and which not.

Moreover, many due process claims can be characterized as challenges to either a random act or an established procedure.

For example, in the *Logan* case, *supra,* plaintiff's suit could be framed as a claim against the negligent act of the commission in failing to convene a timely conference or against the established procedure requiring dismissal of charges when a conference is untimely convened. Likewise in the *Parratt* case plaintiff's claim could, as the Court recognized, have been directed against either the random act that caused the loss of mail or the adequacy of the prison's established procedure for insuring that mail was delivered to the addressee. 451 U.S. at 545, 101 S.Ct. at 1917. In short, many established state procedures may breed a certain predictable rate of deprivations which, viewed individually, appear random. In this light the articulation of standards for assessing the constitutional adequacy of established procedure is critical.

The Supreme Court has had occasion to suggest general standards for determining what procedures are due. In *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976), the Court said three factors should be weighed: (1) the private interest at stake; (2) the probable value of additional procedural safeguards, and (3) the governmental interest, including the administrative burden of additional procedural requirements.

The three sets of distinctions—discussed above—relied on by lower courts in the aftermath of the *Parratt* case are nothing more than derivative or subsidiary considerations in this overarching and fundamental due process analysis. Thus, the difference between liberty and property interests is significant because it bears on the private interest asserted. A liberty interest may justify the provision of more substantial predeprivation safeguards than a property interest. The distinctions between negligent acts and intentional acts and between random and unauthorized acts and established procedure are relevant to both the probable value of more safeguards and the government's interest. The Supreme Court's emphasis on the impracticability of predeprivation safeguards against random acts of negligence was clearly tied to these same two factors. 451 U.S. at 542–43, 101 S.Ct. at 1916.

In this case the private interest at stake was vital—a man was threatened with death by a proven violent assailant. The existing procedure for insuring alternate lockouts was minimal and slipshod; and there is reason to believe that additional measures would prevent the kind of thing that happened to plaintiff. Finally, the administrative cost of the kinds of additional procedures suggested by plaintiff appears slight.

It is true that courts should hesitate to interfere in the daily administration of prisons. Therefore, in judicial assessment of the three elements discussed above, particularly the second and third, the judgment of prison authorities should be given considerable weight. But even according substantial deference to the judgment of prison officials, the court concludes that plaintiff has raised triable issues as to whether defendants' established measures for protecting his vital liberty interest afforded him the safeguards he was due.

Defendant Ward moves to dismiss the § 1983 claim as against him because he did not personally participate in the incident. It is true that Ward cannot be held liable under the doctrine of *respondeat superior.* *See Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Here, however, plaintiff challenges the constitutionality of the customary practice of the prison authorities. The question is whether Ward, in his official capacity as Commissioner of Correction of the City of New York, can be held responsible for that customary practice. The court cannot make that determination on the present record, and it will await development of the full record at trial.

Defendants' motion is denied. So ordered.